**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 26-10854

————————————————

RICHARD L. JACKSON,
JACKSON FOR GOVERNOR, INC.,

*Plaintiffs-Appellants*
*Cross-Appellees,*

*versus*

WILLIAM BURTON JONES,
   in his personal capacity, and in his official
   capacity as the Lieutenant Governor of Georgia,
WBJ LEADERSHIP COMMITTEE, INC.,
BURT JONES FOR GEORGIA, INC.,

*Defendants-Appellees*
*Cross-Appellants,*

CHRISTOPHER M. CARR, et al.,
   in their official capacities,

*Defendants.*

2                    Opinion of the Court                    26-10854

———————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:26-cv-00782-TWT

———————————

———————————

No. 26-10886

———————————

RICHARD L. JACKSON,
JACKSON FOR GOVERNOR, INC.,

*Plaintiffs-Appellees,*

*versus*

WILLIAM BURTON JONES, in his personal
capacity, and in his official capacity as the
Lieutenant Governor of Georgia,
WBJ LEADERSHIP COMMITTEE, INC.,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:26-cv-00782-TWT

———————————

Before WILLIAM PRYOR, Chief Judge, and JORDAN and GRANT,
Circuit Judges.

GRANT, Circuit Judge:

Gubernatorial candidate Rick Jackson is the latest in a line of would-be governors who have objected to the uncapped fundraising opportunity that Georgia law offers incumbent Governors and Lieutenant Governors.  And he is likely correct.  The First Amendment does not forgive such favoritism.

To receive the preliminary injunctive relief he seeks, Jackson must also show a likelihood that the conduct of his opponent's "leadership committee" qualifies as state action.  This question is admittedly somewhat closer, in part because federal courts have not confronted a similar statute from any other jurisdiction.  But the actions of this one-of-a-kind "leadership" entity—the existence of which is attributable to the State and the challenged conduct of which can occur only with a specific state official at its helm—are fairly characterized as state action.

Jackson is thus likely to succeed on the merits question, and the other preliminary injunction factors favor him as well—both the equities between the parties and the public interest point in favor of resolving the irreparable First Amendment injury caused by Georgia's singular campaign finance innovation.  We affirm the district court's preliminary injunction.

## I.

The Georgia Government Transparency and Campaign Finance Act comprehensively regulates campaign financing and spending in state elections.  OCGA §§ 21-5-1, 21-5-2.  The law imposes limits on the amount of money that candidates for statewide office can accept from individual contributors.  *Id.* § 21-

5-41(a).  Currently, those limits are $8,400 for primary and general elections, and $4,800 for runoff elections.  *See id*. § 21-5-41(a), (k).[1] Georgia has had contribution limits in place, indexed for inflation, since at least the year 1990.[2]

Campaign committees are subject to those same limitations. *See* OCGA § 21-5-41(a).  Georgia also allows various other political committees that have different rules, but none of them allow both contributions of an unlimited amount and direct support of a candidate.  Independent committees, for example, can accept unlimited amounts from an individual donor, but cannot coordinate their expenditures with candidates or their campaign committees.  *Id*. § 21-5-3(15); Ga. Comp. R. & Regs. 189-6-.04.

Next take political action committees, which also face no restrictions on the amount of money they can accept from individual donors, but their own contributions to candidates cannot exceed the usual limits.  *Cf*. OCGA § 21-5-41(a).  Hybrid PACs fall somewhere in the middle; they can contribute directly to candidates (like a PAC) and expend uncoordinated funds to support or oppose a candidate (like an independent committee), but only if the committee maintains separate accounting for the two pots of

---

[1] The statutory contribution limits are indexed for inflation.  *See* OCGA § 21-5-41(k); *Contribution Limits*, Ga. State Ethics Comm'n, https://ethics.ga.gov /contribution-limits/ [https://perma.cc/R9Y9-UNHS].

[2] *See* 1997 Op. Att'y Gen. 97-8 (Ga.), https://law.georgia.gov/opinions/97-8 [https://perma.cc/R3SZ-WQHF].

26-10854                Opinion of the Court                5

money and limits any direct candidate contributions to the typical contribution limits.[3]

The "leadership committees," authorized by the Georgia legislature in 2021, are birds of a different feather.  *Id.* § 21-5-34.2. They are bound by neither contribution limits nor restrictions on direct support for candidates—they can both give and receive unlimited dollars.  *Id.* § 21-5-34.2(e).  And they can directly coordinate with any campaign.  *See id.* § 21-5-34.2(d).

Sounds great, at least from the candidate's perspective.  But not all candidates can take advantage—only those occupying a few particular roles can form and chair leadership committees.  *See id.* § 21-5-34.2(a).  Most relevant here, and in past litigation over this provision, is that two major players can chair leadership committees ahead of a primary election for statewide office—the incumbent Governor and the incumbent Lieutenant Governor.[4] *Id.*

The consequences are significant—a complete release from generally applicable contribution limitations in a primary election

---

[3] *See* Ga. State Ethics Comm'n, Adv. Op. 2015-02, at 3, https://ethics.ga.gov /wp-content/uploads/2022/02/2015.06.25-AO-2015-02-PAC-Registration-Executed.pdf [https://perma.cc/HNK3-5UDX]; *see also* OCGA § 21-5-41(a).

[4] After a primary election, the nominees of a political party for Governor and Lieutenant Governor selected during that primary may also form leadership committees.  OCGA § 21-5-34.2(a).  Additionally, the leaders of the majority and minority caucuses of the State House and Senate may create leadership committees.  *Id.*

for these two officials.  And only these two officials.  So ahead of a primary election, a leadership committee can accept contributions in any amount and then use those contributions to directly support the sitting Governor or Lieutenant Governor's campaign.  The incumbent's opponents, however, are not so lucky.  Other than the majority and minority caucus leaders of both legislative houses, no one else can establish a leadership committee.  Not a legislator, not another statewide elected official, and not a private citizen.  These candidates have all the usual contribution limits imposed by Georgia law.[5]

These "leadership committees" have raised eyebrows during the last several election cycles, and this year is no exception. Georgia's Lieutenant Governor, Burt Jones, is seeking the Republican nomination for Governor.  In 2022, Jones set up a leadership committee, the WBJ Leadership Committee, Inc., under § 21-5-34.2.    Free from contribution limits, his leadership committee has raised millions of dollars—including multiple individual contributions of $100,000.  And Jones has used those funds to support his campaign.

The same rules do not apply to Richard Jackson, who entered the gubernatorial race on February 3, 2026, and also seeks the Republican nomination.  Currently a private citizen, he cannot

---

[5] One other thing: the leadership committee statute relieves the incumbent Governor and Lieutenant Governor from the restrictions that Georgia law has long placed on candidates accepting campaign contributions during legislative sessions.  *See* OCGA § 21-5-35(a).

establish a leadership committee. *See id.* § 21-5-34.2(a). So while his primary opponent has unlimited fundraising and unrestrained coordination, Jackson does not.

Chafing against these comparative limits, a week after he entered the race, Jackson (and his campaign committee, Jackson for Governor) filed a complaint against Jones, the WBJ Leadership Committee, Burt Jones for Georgia, Georgia's Attorney General, and the members of the Georgia State Ethics Commission. Jackson sought declaratory and injunctive relief under 42 U.S.C. § 1983, arguing that the leadership committee statute violates his rights under the First and Fourteenth Amendments. The next day, he filed an emergency motion for a preliminary injunction seeking, among other things, to enjoin political fundraising and spending by Jones's leadership committee.

Before the district court ruled on that motion, Jackson filed one more—a motion for a temporary restraining order. In that motion, Jackson alleged that Jones's leadership committee sharply increased its spending after the complaint was filed. The district court swiftly held a hearing and granted a TRO from the bench. The court's written order, filed the next week, barred Jones's leadership committee from raising or spending money in support of Jones's gubernatorial campaign. *Jackson v. Jones*, No. 26-cv-00782, 2026 WL 561148, at *12 (N.D. Ga. Feb. 27, 2026). The record is not clear about whether spending stopped.

A few weeks later, the district court held a hearing on Jackson's motion for a preliminary injunction. Having concluded

that Jackson was substantially likely to succeed on the merits, the court entered a preliminary injunction against the leadership committee.  The committee orally moved to stay the preliminary injunction pending an appeal to this Court, and after hearing arguments from the parties, the court granted that motion.

The district court's written preliminary injunction order followed.  *See Jackson v. Jones*, No. 26-cv-00782, 2026 WL 781193 (N.D. Ga. Mar. 19, 2026).  Building on three earlier orders from the Northern District of Georgia, all holding that the leadership committee statute likely violates the First Amendment, the district court concluded that Jackson was likely to succeed on the merits. *Id.* at *7–8 (citing *Perdue v. Kemp*, 584 F. Supp. 3d 1310, 1321–27 (N.D. Ga. 2022); *One Ga., Inc. v. Carr*, 601 F. Supp. 3d 1291, 1304–07 (N.D. Ga. 2022); *Graham v. Carr*, 634 F. Supp. 3d 1343, 1354–56 (N.D. Ga. 2022), *vacated as moot sub nom.*, *Graham v. Att'y Gen., State of Ga.*, 110 F.4th 1239 (11th Cir. 2024)).[6]  The court also concluded that Jones's leadership committee likely qualified as a state actor, making it subject to suit under § 1983.  *Id.* at *6–7.  As a result, and

---

[6] In fact, this case marks the seventh time that the leadership committee statute has been challenged in federal court since its enactment.  Its constitutionality has been tested in three other cases in the Northern District of Georgia, in addition to the cases cited above.  Those cases did not result in preliminary injunctions for reasons unrelated to the merits of the First Amendment question.  *See* Order at 16–20, *Carr v. WBJ Leadership Committee*, No. 25-cv-04426 (N.D. Ga. Aug. 8, 2025), Dkt. No. 22 (standing); Order at 26–29, *Democratic Party of Ga. v. Kemp*, No. 24-cv-03154  (N.D. Ga. Sept. 19, 2024), Dkt. No. 23 (standing); *Safe Affordable Ga. v. Kreyenbuhl*, No. 25-cv-06985, 2026 WL 1072927, at *6 (N.D. Ga. Jan. 27, 2026) (scope of the injunction).

after weighing the remaining preliminary injunction factors, the court enjoined the leadership committee from "soliciting contributions and making any expenditures in support of" Jones's campaign for Governor—that is, until he "becomes the nominee of the Republican Party or further order of this Court, whichever comes first." *Id.* at *13.

The district court stayed that injunction pending appeal, citing "exceptional circumstances." *Id.* at *10. This Court subsequently denied Jackson's motion to vacate the stay pending appeal, but also expedited this appeal.

## II.

We review the district court's grant of a preliminary injunction for abuse of discretion, reviewing underlying legal conclusions de novo and factual findings for clear error. *See Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020); *cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006). Because a preliminary injunction is an "extraordinary and drastic remedy," it is appropriate only when the moving party can show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020).

### III.

The defendants first challenge Jackson's Article III standing to seek a preliminary injunction against Jones's leadership committee. We see little to discuss, despite the defendants' "spirited efforts to overcomplicate these questions." *Mobile Baykeeper, Inc. v. Ala. Power Co.*, 175 F.4th 1316, 1321 (11th Cir. 2026). "A party has standing when it (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355 (11th Cir. 2024) (quotation omitted).

An injury in fact is one "that is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 925 (11th Cir. 2020) (en banc). As this Court and the Supreme Court have already recognized, a candidate is harmed by the "grant of a competitive advantage—an increase in the ability of [a candidate's] opponent to speak." *Scott v. Roberts*, 612 F.3d 1279, 1291–92 (11th Cir. 2010); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 739 (2008). Georgia's leadership committee statute provides Jones with an opportunity to raise "additional funds" relative to Jackson. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 747 (2011) (quotation omitted); *see* OCGA § 21-5-34.2(e). Jones's leadership committee has taken that opportunity, which makes Jackson's "own speech . . . less effective." *Bennett*, 564 U.S. at 747 (quotation omitted). We agree with the district court that Jackson suffers injury when he is "confronted with an uneven electoral

playing field between incumbents and non-incumbents." *Jackson*, 2026 WL 781193, at *4.

Nor can we argue with the district court's conclusion that Jackson's injury is traceable to the leadership committee and its actions—not just the statute. *See id.* at *4–5. "The second element of standing can be referred to as either causation or traceability, and requires plaintiffs to allege that their injuries are caused by the conduct they challenge." *Mobile Baykeeper*, 175 F.4th at 1323. Jones is wrong to suggest that any injury Jackson suffers must be from what the statute allows in the abstract, rather than actions taken by Jones's leadership committee. *Cf. Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006) (McConnell, J.) ("The mere presence on the statute books of an unconstitutional statute . . . does not entitle anyone to sue."). The existence of the leadership committee statute in the Georgia codebook does not cause Jackson's injury. The Jones committee's taking advantage of the uneven playing field available under that statute does. *See Jackson*, 2026 WL 781193, at *4–5.

And that injury would be redressed by an order disallowing the committee from doing just that: using the uneven scheme to benefit Jones's campaign. *See id.* at *5. This is not a close call. "Indeed, redressability is often just the flip side of causation: If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Mobile Baykeeper*, 175 F.4th at 1323 (quotation omitted). As the district court explained, the harm posed by the leadership

committee's conduct will cease if Jackson obtains the injunctive relief he seeks. *Jackson*, 2026 WL 781193, at *5.

Jackson has shown that he has standing to pursue the preliminary injunction he seeks.

## IV.

This is not the first time that the leadership committee statute has been challenged. But it *is* the first time it has arrived here in time for a decision. We agree with each district court that has addressed the First Amendment question: our Constitution does not allow States to favor some candidates over others with different contribution limits. Whatever the justification (and there is not much of one here), "allowing the government to set the terms of the debate is poison, not antidote." *Honeyfund.com Inc. v. Governor, State of Fla.*, 94 F.4th 1272, 1283 (11th Cir. 2024). Jackson is thus likely to succeed in showing that he has suffered a First Amendment injury.

But that is not the end of the story—we also consider one other merits-related question. Jackson brought this suit under 42 U.S.C. § 1983, which provides a cause of action for deprivations of federal rights by persons acting "under color of" state law. So he needs to show not only that he likely suffered a constitutional injury, but also that it is likely that a state actor committed that deprivation. *See Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992). Again, we think it likely that Jackson prevails. Georgia's leadership committee statute gives special authority only to select incumbent officials, and that authority dries up as soon as they no

longer wield official state power.  So although the Jones leadership committee is formally a private entity, its fundraising advantages are available only as a consequence of Jones's status as an incumbent Lieutenant Governor.  That combination is enough to make its actions in connection with those advantages creditable to the State for purposes of § 1983.

## A.

The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Bennett*, 564 U.S. at 734 (quotations omitted).  After all, that protection "was designed to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley v. Valeo*, 424 U.S. 1, 49 (1976) (quotations omitted).  What's more, both political spending and candidate contributions "fall within the First Amendment's protection of speech and political association." *Ala. Democratic Conf. v. Att'y Gen. of Ala.*, 838 F.3d 1057, 1062 (11th Cir. 2016) (quotation omitted).  Indeed, such interests are among "the most fundamental First Amendment activities." *Buckley*, 424 U.S. at 14.

Even so, as compared to expenditures, contributions "lie closer to the edges than to the core of political expression." *Ala. Democratic Conf.*, 838 F.3d at 1062–63 (quotation omitted).  So while restrictions on expenditures must survive strict scrutiny, contribution limits satisfy constitutional review if they are "closely

drawn to match a sufficiently important interest." *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 162 (2003) (quotations omitted); *see Buckley*, 424 U.S. at 25. Such interests are limited. In fact, "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *Ala. Democratic Conf.*, 838 F.3d at 1064 (quotation omitted).

No one disputes that the baseline contribution limits imposed by Georgia's Campaign Finance Act satisfy that standard. The Supreme Court has repeatedly upheld "government-imposed limits on contributions to candidates," explaining that those restrictions are typically justified by an interest in combatting political corruption. *Bennett*, 564 U.S. at 735, 749; *see Buckley*, 424 U.S. at 23–25.[7]

The leadership committee statute is different. It disrupts the Georgia scheme's evenhanded application by providing effectively unlimited fundraising for some—but not all—candidates. Jones, through his leadership committee, can accept campaign contributions in any amount and spend them directly on his own election. Jackson cannot. He contends that the Supreme Court's decision in *Davis v. Federal Election Commission* all but compels the

---

[7] The leadership committees also have a few other special advantages, most prominently the ability to fundraise during the annual legislative session when other officeholders are barred from doing so. *See* OCGA § 21-5-35(a). Because Jackson is not an officeholder, he had no limits in that regard. So that provision is not at issue in this litigation.

conclusion that this uneven scheme violates his First Amendment rights. 554 U.S. 724. We agree: such schemes are "antithetical to the First Amendment." *Id.* at 744.

To start, the Jones leadership committee has never even tried to articulate an anticorruption interest justifying the statutory scheme. Instead, the committee makes the remarkable assertion that § 21-5-34.2 "does not implicate First Amendment concerns." We would be hard pressed to reach that conclusion even in the first instance, but *Davis* has already given us the answer. *See id.* at 743–44. There, the Supreme Court considered the constitutionality of a federal election law that, in its words, sometimes imposed "different campaign contribution limits on candidates competing for the same congressional seat." *Id.* at 728.

Under the so-called "Millionaire's Amendment," when a candidate's personal election spending exceeded a certain amount, that candidate's opponent could then receive contributions three times larger than the ordinary limits. *Id.* at 729, 736. Because the self-financed candidate was still subject to the generally applicable contribution limits, the scheme effectively imposed different contribution limits "on candidates vying for the same seat." *Id.* at 729, 743–44. The differential between the two gave self-funded candidates a reason to keep their personal spending below the statutory trigger. *Id.* at 738–39. That "scheme of discriminatory contribution limits," like the one here, was not justified by "any governmental interest in eliminating corruption or the perception of corruption," and it could not survive First Amendment

challenge. *Id.* at 740. The Court memorably described it as a "drag on First Amendment rights." *Id.* at 739.

Whether before or after *Davis*, the Supreme Court has "never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other." *Id.* at 738; *see also Bennett*, 564 U.S. at 736. Neither have we. In *Scott v. Roberts*, for example, we rejected a Florida campaign finance law subsidizing candidates who participated in the state's public financing system. 612 F.3d at 1281. The subsidy was triggered when a nonparticipating candidate exceeded the statutory expenditure limit; after that, the State gave the participating candidate matching funds, dollar-for-dollar for any amount the nonparticipating opponent spent above the threshold. *Id.* at 1286. As in *Davis*, the problem was "the grant of a competitive advantage"—that is, "an increase in the ability of [the candidate's] opponent to speak." *Id.* at 1291–92. And there too, the State could not show that any "anticorruption interest" justified the statute's asymmetrical treatment of candidates. *Id.* at 1292. We concluded that the plaintiff was "exceedingly likely" to show a First Amendment violation because "*Davis* compel[led] this conclusion." *Id.* at 1297.

Here too, the leadership committee scheme "produces fundraising advantages for opponents in the competitive context of electoral politics." *Davis*, 554 U.S. at 739. And it directly affects speech "at the core of our electoral process and of the First Amendment freedoms." *Williams v. Rhodes*, 393 U.S. 23, 32 (1968).

Before and during the 2026 gubernatorial primary, only Lieutenant Governor Jones can chair a leadership committee. So only Lieutenant Governor Jones can use that committee to accept unlimited contributions to directly further his own campaign. That places Jackson at a direct disadvantage: he remains subject to the ordinary contribution limits imposed by Georgia law. The leadership committee scheme thus imposes—quite directly— different contribution limits "on candidates vying for the same seat." *Davis*, 554 U.S. at 744. That step is plainly "antithetical to the First Amendment" under *Davis*. *Id.* It is no surprise that each district court to consider the matter has reached the same answer.[8]

The Jones defendants resist this conclusion—though not with any serious defense of the statute. They offer no justification for its favoritism in their briefing, and instead contend that the First Amendment is not implicated because *Davis* only applies when uneven contribution limits follow a self-financing trigger. No. What prompted First Amendment review in *Davis* was "the grant of a competitive advantage—an increase in the ability of [the candidate's] opponent to speak." *Scott*, 612 F.3d at 1291–92; *see Davis*, 554 U.S. at 739. Though the particulars differ, the root problem here is the same. Georgia law gives Jones an unconstitutional advantage over his competitors in the Republican primary. *See Scott*, 612 F.3d at 1291–92. We do not see how the

---

[8] *See Perdue*, 584 F. Supp. 3d at 1321–27; *One Ga.*, 601 F. Supp. 3d at 1304–07; *Graham*, 634 F. Supp. 3d at 1354–56; *Jackson*, 2026 WL 781193, at *7–8; *Safe Affordable Ga.*, 2026 WL 1072927, at *5.

First Amendment can tolerate an exception that plays favorites with contribution limits, offering a few candidates unlimited contributions with no serious justification.

Jackson, in short, has all but conclusively demonstrated that he is likely to succeed in showing a First Amendment infirmity in the leadership committee statute's "discriminatory fundraising limitations." *See Davis*, 554 U.S. at 739.[9]

## B.

That is not, however, the end of our analysis. Section 1983 allows plaintiffs to hold state officials accountable for depriving them of rights secured by federal law or the Constitution. So a plaintiff seeking relief under that statute must show that the unlawful conduct he challenges "was committed by a person acting under color of state law." *Harvey*, 949 F.2d at 1130.[10] Traditionally, that standard is met by proving that the defendant in a § 1983 action "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quotation omitted).

---

[9] Given our resolution, we need not address Jackson's equal protection claim.

[10] This requirement has consistently been treated as equivalent to the Fourteenth Amendment's state action requirement, so we use the terms interchangeably, and consider both lines of precedent, too. *See Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1276 n.4 (11th Cir. 2003).

That cashes out to two requirements.  First, "the deprivation must be caused by the exercise of some right or privilege created by the State." *Harvey*, 949 F.2d at 1130 (quotation omitted).  So far, so good—Georgia law straightforwardly establishes the discordant contribution-limit carveout that Jackson challenges and that Jones's leadership committee exploits.  But the second presents a tougher challenge, at least for Jackson: "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* (quotation omitted).  "[M]erely private conduct" cannot be targeted, "no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quotations omitted).  Put differently, stopping "[i]ndividual invasion of individual rights" is not the object of § 1983. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) (quotation omitted).

Even so, nominally private conduct carried out by a formally private actor is still actionable under § 1983 when that "conduct is fairly attributable to the State." *Sullivan*, 526 U.S. at 50.  And when a state official is involved, the "dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1523 (11th Cir. 1995).  Though the Supreme Court has set out certain parameters for deciding this question, it has cautioned that it would be "an impossible task" to "fashion and apply a precise formula for recognition of state responsibility." *Burton*, 365 U.S. at 722 (quotation omitted).  The Court has also emphasized that the "framework of the peculiar

facts" in each case will determine whether there is state action. *Id.* at 726.

This Court, drawing from Supreme Court case law, has recognized "three tests for establishing state action by what is otherwise a private person or entity: the public function test, the state compulsion test, and the nexus/joint action test." *Harvey*, 949 F.2d at 1130. Jackson travels only under the third. The "relevant inquiry" there "is whether the State has so far insinuated itself into a position of interdependence with the private parties that it was a joint participant in the enterprise." *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (alteration adopted and quotation omitted).

We have cautioned that this "rule language" sometimes "suffers from a lack of context." *Charles v. Johnson*, 18 F.4th 686, 696–97 (11th Cir. 2021). At bottom, our precedents show that the State (or a state official) must have had "some affirmative role" in bringing about "the particular conduct underlying a claimant's civil rights grievance." *Rayburn*, 241 F.3d at 1348 (emphasis and quotation omitted); *see also Cobb v. Ga. Power Co.*, 757 F.2d 1248, 1251 (11th Cir. 1985). But we need not find an exact match to a past case—as both we and the Supreme Court have emphasized, "this analysis will be heavily fact specific." *Charles*, 18 F.4th at 696 (citing *Burton*, 365 U.S. at 722). That's especially true here, where we consider a statute unlike any other the courts have tested.

Jackson has likely met his burden. His primary assertion in support of finding state action is that the leadership committee

exists only by virtue of Jones's status as the Lieutenant Governor. Absolutely: if Jones were not the Lieutenant Governor, he could not form a leadership committee. *See* OCGA § 21-5-34.2(a). And whenever he "ceases to hold the office," his committee must either name another "eligible person" as chairman or dispose of its remaining assets. *Id.* § 21-5-34.2(c). Effectively, the committee must dissolve as soon as Jones is no longer the Lieutenant Governor. These requirements are a firm signal that the leadership committee must be acting under color of state law because Jones's status—and only his status—enables his leadership committee to behave in a way that violates Jackson's constitutional rights.

But what of the fact that when an official campaigns for office, that conduct is generally considered private rather than public? *See, e.g.*, *Campbell v. Reisch*, 986 F.3d 822, 825 (8th Cir. 2021). To start, the state action issue only arises when the challenged conduct is ostensibly private; the question is whether the State or its officials are so embedded into that conduct that it should be credited to the State. And the facts here show that the Jones leadership committee's fundraising fits the bill. One key difference between ordinary candidate behavior and the actions challenged in this lawsuit is that state officials do not—or at least should not— have special rules that make it easier for them to win elections. So conduct permitted by those special rules, available only to specified state actors, is reasonably credited to the State. After all, a private party's conduct does not become state action simply because it is "made possible by Georgia statute." *Harvey*, 949 F.2d at 1130. Instead, the State or one of its officials must have taken some action

as a "joint participant in the enterprise." *Rayburn*, 241 F.3d at 1348 (quotation omitted). That's exactly what happened here.

The Lieutenant Governor himself, a proper defendant in his official capacity, has made an "active choice to partner with a private entity in a way that can impart liability" by participating in the leadership committee enterprise. *Charles*, 18 F.4th at 696. Jones as a private actor would have no access to the advantages offered by a leadership committee. Only Jones as a government actor—the sitting Lieutenant Governor—can raise unlimited funds and spend those funds directly on his campaign. This sort of "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *United States v. Classic*, 313 U.S. 299, 326 (1941).

Does that mean that all campaign action is converted into official activity? Thankfully not. No case says once an entity is a state actor for one purpose it is a state actor for all other purposes. Quite the opposite, in fact: under § 1983, "a private entity may be designated a state actor for some purposes but still function as a private actor in other respects." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 814 (9th Cir. 2010). Take the Supreme Court's cases holding that even political parties can be state actors when state law "prescribes an election process that gives a special role to [them]." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 573 (2000). In *Smith v. Allwright*, for example, the Court treated the Texas Democratic Party's racially discriminatory primary process

as state action. 321 U.S. 649, 663 (1944). That conclusion did not mean that everything the Party did took on constitutional dimensions as an act of the state. Same goes here. Leadership committee conduct that is not legally attributable to Jones's status as an officeholder—actions that *any* candidate's campaign committee could take—likely would not qualify as state action.

Jones pushes back, arguing that Jackson cannot show state action because he has pointed to nothing suggesting that the State itself has actively participated in the leadership committee's raising and spending funds to support his gubernatorial campaign. This objection misses the mark. To qualify as a state actor, a private party's decisions or purposes need not be formally blessed by the State or directly benefit the State. Entwinement with a participating state official's own ends, lawful or not, is enough: "The involvement of a state official plainly provides the state action essential to show a direct violation of petitioner's [First] Amendment rights." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157 n.5 (1978) (alterations adopted and quotation omitted).

So while the State cannot be said to have a particular interest in supporting the campaign of Burt Jones, its role is not, as the dissent would put it, "entirely permissive." Dissenting Op. at 3. That the leadership committees are formally private cannot obscure that they are designed under state law "to attain governmental objectives" and are "directed and controlled" by state officials. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001); *see also Lebron v. Nat'l R.R. Passenger Corp.*,

513 U.S. 374, 398 (1995). For one, the leadership committee statute's asymmetric advantages reveal a government policy favoring a few incumbent officials.[11] That conclusion is only supported by the fact that Georgia has failed to articulate a credible justification for the statute, and the Jones committee has offered no justification at all. *See Jackson*, 2026 WL 781193, at *8. A state cannot launder impermissible objectives by running them through a private entity. Under these circumstances, "private use of the challenged state procedures with the help of state officials constitutes state action." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 933 (1982).

The Jones leadership committee protests that if this were the rule, "every Georgia pharmacist would act as an arm of the state when prescribing controlled substances pursuant to a professional license." No. To start, it is obvious that state licensure alone does not create state action. *See Harvey*, 949 F.2d at 1132. But if a state statute created a special class of pharmacies with unique authority, available if and only if they were owned and operated by the state's incumbent Governor or Lieutenant Governor, you can bet that

---

[11] We note that every state official with some high-level role in passing or signing legislation has the opportunity to be involved in a leadership committee. *See* Ga. Const. art. V, § I, para. III ("The Lieutenant Governor shall be the President of the Senate."); OCGA § 21-5-34.2(a) (majority and minority caucus leaders of both legislative houses may form leadership committees). In contrast, no official without some role in the legislative process has that opportunity during the primary election.

there would be a good case for treating those pharmacies' conduct as state action.

Going beyond the strawman, this assertion reflects a more fundamental error. Treating an entity as an arm of the state is different, both legally and conceptually, than treating certain actions as creditable to the state in litigation. *See, e.g.*, *Walker v. Jefferson Cnty. Bd. of Educ.*, 771 F.3d 748, 751 (11th Cir. 2014). Conflation of these two concepts infuses many of the arguments against finding state action. The Jones brief, for example, argues that "the district court's order dangerously transformed a committee *authorized* by state law into one that is an *arm of the state* itself," and "threatens not only conduct protected by the First Amendment, but every decision of every licensed person or corporation in Georgia." Again, no. Neither the district court nor this one has said that the Jones leadership committee is an "arm of the state," with every one of its acts a government act, and all of the rules that restrict government entities applying to it. And surely no one is asserting that the Jones leadership committee has Eleventh Amendment immunity as an alter ego of the State of Georgia. Finding that the committee's acts can be attributed to the State does not mean that the committee *is* the State.

We close by reemphasizing that our decision is narrow. Unless courts come across another statute built like this one, today's holding is unlikely to have significant grip. After all, only "by sifting facts and weighing circumstances on a case-by-case basis can a nonobvious involvement of the State in private conduct be

attributed its true significance." *Reitman v. Mulkey*, 387 U.S. 369, 378 (1967) (quotations omitted). Here, the state legislature created, the state Ethics Commission blesses, and state officials run, these entities that offer fundraising favoritism to a few incumbent officials. And the State conditions its statutory favoritism plan on the direct involvement of an incumbent official during his term of office. These points are more than enough to construe the Jones leadership committee's beyond-the-limits fundraising as state action. The leadership committee, a formally private actor, "operates as a willful participant in joint activity" with the State's Lieutenant Governor. *Brentwood*, 531 U.S. at 296 (quotation omitted). This conclusion "looks not to form but to an underlying reality": the unconstitutional acts of Jones's ostensibly private leadership committee cannot be disentangled from his status as a state official. *Id.* at 301 n.4.

The sum of it is this: the leadership committee statute offers certain extra powers, available to no private citizen, that are entirely dependent on Jones's status as Lieutenant Governor. Jackson has likely shown that, when the Jones leadership committee exercises those powers, its conduct is fairly attributed to the State.

## C.

Because Jackson has shown a likelihood of success on the merits, we next consider whether he has met the remaining factors required to obtain a preliminary injunction. *See Otto*, 981 F.3d at

860. We see no abuse of discretion in the district court's assessment of the remaining equitable factors.

First, the district court correctly noted that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Jackson*, 2026 WL 781193, at *8 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The leadership committee statute prevents Jackson from accepting campaign contributions on an equal footing with Jones's leadership committee—a First Amendment harm that cannot feasibly be remedied by a post-election monetary judgment. *See Scott*, 612 F.3d at 1295.

Next, the district court did not abuse its discretion in determining that the balance of harms favors a preliminary injunction. *See Otto*, 981 F.3d at 860. Jones points out that an injunction against his use of committee funds to support his campaign would decrease his speech during the primary election, as he "will have less money to support his campaign." *Scott*, 612 F.3d at 1296. And he contends that he has "budgeted and allocated campaign resources in reliance upon the enforceability" of the leadership committee statute. While we do not doubt that an injunction in Jackson's favor will likely cause Jones to speak less, Jones remains free to receive contributions and make expenditures through his campaign committee, Burt Jones for Georgia. Yes, those contributions are limited, but contribution limits have been in place for much longer in Georgia than the leadership committee statute has allowed certain candidates to circumvent them.

Plus, Jones was on notice "that the [statute] was vulnerable to legal challenge." *Id.* The Northern District of Georgia had previously concluded, in three separate cases, that the leadership committee was likely unconstitutional. *See Perdue*, 584 F. Supp. 3d at 1327; *One Ga.*, 601 F. Supp. 3d at 1307; *Graham*, 634 F. Supp. 3d at 1356. Jones "should have known" since at least 2022 that "he could not comfortably rely" on his leadership committee to bear the brunt of his campaign costs. *Scott*, 612 F.3d at 1296.

Jones also argues that he will be worse off because the Jackson Campaign continues to outspend him despite being subject to contribution limits. But we decline to discount Jackson's harm just because he exercises his First Amendment "right to spend personal funds for campaign speech." *Davis*, 554 U.S. at 738–39. And finally, a preliminary injunction that does nothing more than prevent Jones from continuing to benefit from an uneven contribution scheme is not contrary to the public interest: "it is in the public interest to protect First Amendment rights." *Honeyfund.com*, 94 F.4th at 1283. In short, the district court did not abuse its discretion in concluding that the public interest would be served by an injunction.

⋆    ⋆    ⋆

We also offer a brief response to the dissenting opinion's suggestion that a different method of challenging the leadership committee statute would be more appropriate.

The dissent surmises that Jackson "could have sought a remedy against the state officials responsible for enforcing the

contribution limits against him: members of the State Ethics Commission." Dissenting Op. at 5. And it goes on to assert that "it is not difficult to see why" Jackson did not choose that path. *Id.* Jackson's personal wealth could have something to do with the remedy he seeks, as the dissent suggests. *See id.* But it is not our place to assume so, and *Davis* makes clear that federal courts cannot penalize a candidate for self-funding his campaign. *See* 554 U.S. at 738–39.

In any event, Jackson's litigation strategy has a proven track record: the district courts have been granting preliminary injunctions against leadership committees on this basis since 2022, shortly after the statute was passed. *See Perdue*, 584 F. Supp. 3d at 1328–29 (preliminary injunction against Governor Kemp's leadership committee in suit by David Perdue); *One Ga.*, 601 F. Supp. 3d at 1309 (same in suit by Stacey Abrams). In contrast, they have rejected several candidates' requests to bar the State from enforcing its ordinary contribution and coordination limits against them. *See, e.g.*, Order at 32–34, *One Ga., Inc. v. Carr*, No. 22-cv-01130 (N.D. Ga. Apr. 14, 2022), Dkt. No. 45 ("This Court will not rewrite Georgia law to enable One Georgia [the Abrams committee] to stand in the same shoes as a leadership committee that, in Plaintiffs' view, is operating in violation of the First Amendment."). So the theory that Jackson raised and that this Court accepts is not "novel." Dissenting Op. at 1.

It is also, we think, more likely to be correct. Because we have identified a constitutional problem with the statute, the

remedial question turns on whether Georgia would have "struck an exception and applied the general rule equally to all, or instead, would have broadened the exception" to cure the constitutional defect. *Sessions v. Morales-Santana*, 582 U.S. 47, 75 (2017). We have no doubt that the best reading of these statutes is the latter—that Georgia would preserve "the general rule." *Id.*; *see also Scott*, 612 F.3d at 1298. To adopt the alternative approach would require deciding that the legislature would prefer to jettison its decades-old, plainly constitutional, and generally applicable contribution limits rather than scrap its bespoke exception advantaging a select set of government officials. We see that as unlikely. And it would also be inconsistent with our ordinary practice: "when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010) (quotations omitted).

The dissent also posits that, in First Amendment cases, the best remedy is the one that leads to more speech. *See* Dissenting Op. at 6. Even if that is generally so as a policy matter, our task today is deciding whether the district court abused its discretion in granting *this* remedy, not whether it could have granted a better one. And the First Amendment itself takes no side in that debate. In fact, the Supreme Court has already rejected the argument that "a court should not cure a First Amendment violation by outlawing more speech." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 633 (2020) (plurality) (quotation omitted) (The "First

Amendment does not tell us which way to cure the unequal treatment in this case.").

Both *Davis* and *Scott*, our two closest First Amendment precedents, support this view, too.   In each case, the courts imposed a remedy that resulted in less speech: the complaining candidates' opponents could no longer take advantage of the enhanced fundraising opportunities offered by the constitutionally invalid statutes.  *See Davis*, 554 U.S. at 744–45; *Scott*, 612 F.3d at 1296–98.   So although campaign spending is plainly considered speech, that does not decide the question.   We do not think, for example, that courts would hesitate to stop candidates from spending funds they had unlawfully received in other contexts.  *See, e.g.*, 52 U.S.C. § 30121(a)(1)–(2) (barring campaign contributions from foreign nationals).

*Davis*, as a matter of fact, imposed exactly the same remedy as we do here—holding all candidates to the ordinary contribution limits (not applying the exceptional heightened limits to more candidates).  *See Davis*, 554 U.S. at 744–45.   That equivalence belies the assertion, cobbled together from *Davis* quotations six pages apart from one another, that "the 'obvious remedy' for a candidate faced with unequal contribution limits is to seek to 'raise or eliminate those limits,' not to demand that his opponent's 'contributions be regulated more strictly.'"  Dissenting Op. at 5 (quoting *Davis*, 554 U.S. at 743, 737).   The Supreme Court has said no such thing, in *Davis* or elsewhere.

That alone is enough to reject the suggestion that applying the same campaign limitation to both Jones and his competitors is fairly characterized as a prior restraint. *See* Dissenting Op. at 6–8. We will not linger on the issue, except to note that the very case the dissenting opinion cites reveals the argument's likely infirmity. In *Alexander v. United States*, the Supreme Court batted down the petitioner's argument that the forfeiture order imposed on his adult entertainment business was a prior restraint. 509 U.S. 544, 549–50 (1993). No, the Court explained: he was perfectly welcome to continue his "expressive activities" with other funds. *Id.* at 550–51. The same goes for Jones and his leadership committee. The district court's order does not ban Jones's campaign speech; it bans using funds obtained in violation of the First Amendment to pay for that speech. In fact, he can still use leadership committee funds to support other candidates, and he can still use campaign committee funds to support his own campaign. *See* OCGA §§ 21-5-34.2(d), 21-5-3(2). No prior restraint, just the same limits that apply to everyone else.

Last, we respectfully reject the complaint that this decision "is all but permanent" because of the timing of the runoff election. Dissenting Op. at 8. That is the nature of such challenges during election season; time is short, and all the parties know it. Plus, the fact that election seasons move quickly is probably the only reason that Jones ever benefitted from his leadership committee's unequal fundraising opportunities in the first place. As we have noted, the district courts have found that the leadership committee statute is likely unconstitutional—counting this case, five out of five times

they have considered the question.  *See Perdue*, 584 F. Supp. 3d at 1321–27; *One Ga.*, 601 F. Supp. 3d at 1304–07; *Graham*, 634 F. Supp. 3d at 1354–56; *Jackson*, 2026 WL 781193, at *7–8; *Safe Affordable Ga. v. Kreyenbuhl*, No. 25-cv-06985, 2026 WL 1072927, at *5 (N.D. Ga. Jan. 27, 2026).  But this appeal is the first chance our Court has had an opportunity to issue a precedential decision.

Today's decision—unanimous in its important conclusion that the First Amendment was violated—should come as no surprise.  So anyone relying on the asymmetrical funding scheme permitted by the leadership committee statute was living on borrowed time.  Jones will now be restrained by the same limits that have applied to every other candidate in this primary election.

\*    \*    \*

The State of Georgia created a hand-in-glove campaign committee for select incumbent officials, and offered those officials the opportunity to raise (and then spend) funds that their competitors could not.  Jackson has shown that it is likely—very likely—that the Georgia leadership committee statute's limited exception to campaign-funding limits puts him on unequal footing in violation of the First Amendment.  He has also shown it likely that the Jones leadership committee is a state actor under § 1983, rather than a completely private party simply making the most of a system that benefits Jones over his competitors.  It is also plain that the denial of a fair First Amendment playing field in campaign finance rules creates an irreparable injury, that the balance of harms weighs in favor of eliminating an unconstitutional

34                       Opinion of the Court                 26-10854

advantage, and that the public interest favors a preliminary injunction that does just that.    We therefore **AFFIRM** the preliminary injunction.

26-10854                JORDAN, J., Concurring                    1

JORDAN, Circuit Judge, Concurring:

I join Judge Grant's opinion for the Court, and agree that Mr. Jackson has shown a likelihood of success on his First Amendment claim, including the color of law component. I join the opinion because I believe it is important to provide some guidance to the bench and bar about the constitutionality of O.C.G.A. § 21-5-34.2, and without my vote we would be left with a confusing 1-1-1 result.

The majority opinion applies *de novo* review with respect to the First Amendment and the color of law issues. As I have stated elsewhere, however, it often makes doctrinal and practical sense to conduct abuse of discretion review when assessing likelihood of success in a preliminary injunction appeal. *See Lebron v. Sec'y, Fla. Dep't of Children & Families*, 710 F.3d 1202, 1218–19 (11th Cir. 2013) (Jordan, J., concurring); *Wood v. Fla. Dep't of Edu.*, 142 F.4th 1286, 1294–96 (11th Cir. 2025) (Jordan, J., dissenting); *Fla. Agency for Health Care Admin. v. Administrator for Ctrs. for Medicare & Medicaid Servs.*, 161 F.4th 765, 789–91 (11th Cir. 2025) (Jordan, J., concurring).

The Supreme Court's cases permit such limited merits review in this procedural posture. And those cases are still good law. *See, e.g., Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (concluding that the district court's determination as to likelihood of success on a First Amendment challenge to a federal statute "was not an abuse of discretion"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 934 (1975) (finding no abuse of discretion in the district court's grant of a preliminary injunction, and explaining that "[t]his is the extent of our

appellate inquiry, and we therefore 'intimate no view as to the ultimate merits of respondents' contentions'") (citation modified).

Many of our cases also conduct abuse of discretion review as to likelihood of success. These cases, moreover, span more than six decades. *See, e.g., Wooten v. Ohler*, 303 F.2d 759, 762 (5th Cir. 1962) ("[W]e do not review the intrinsic merits of the case as such. Rather, our inquiry is whether there has been an abuse of discretion. Our review of the probable merits does not go to the question of whether we would ultimately hold that the trial [j]udge was right or wrong, but only to the ascertainment of whether his action was within his broad range of discretion."); *Di Giorgio v. Causey*, 488 F.2d 527, 528–29 (5th Cir. 1973) ("[O]n an appeal from a preliminary injunction this Court does not concern itself with the merits of the controversy . . . . No attention is paid to the merits of the controversy beyond that necessary to determine the presence or absence of an abuse of discretion.") (citations omitted); *Cafe 207, Inc. v. St. Johns Cnty.*, 989 F.2d 1136, 1137 (11th Cir. 1993) (addressing a First Amendment claim: "Whether the district court's determination of [substantial likelihood of success] is right or wrong, the record before us indicates no abuse of discretion."); *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("The district court did not abuse its discretion in determining that BellSouth had established a substantial likelihood of success."); *LSSi Data Corp. v. Comcast Phone LLC*, 696 F.3d 1114, 1120 (11th Cir. 2012) ("The first question before us is whether the District Court abused its discretion in concluding that LSSi has shown 'a substantial likelihood of success on the merits' of its claim.")

26-10854                 JORDAN, J., Concurring                        3

(internal citation omitted); *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894, 897 (11th Cir. 2024) ("As to the first preliminary injunction prong, the question for us is whether the district court 'abused its discretion in concluding that [Mr. Grayson] has [not] shown a "substantial likelihood of success" on the merits of [his Eighth Amendment] claim.' . . . . In answering that question, we do not decide the ultimate merits of Mr. Grayson's claim.") (citations omitted).

In my opinion, such limited review is warranted here. We are being asked to decide important issues of constitutional law, related to a novel state election statute, on an expedited timeline in the midst of a primary election in Georgia. "When a district court, particularly on a close legal issue of first impression, analyzes whether the plaintiff has shown a substantial likelihood of success on the merits, it is not definitely deciding who wins and who loses; it is instead weighing the parties' arguments and making a probabilistic determination about which side is likely to prevail." *Fla. Agency*, 161 F.4th at 790 (Jordan, J., concurring). I do not see why we should be doing anything different when we conduct appellate review of the grant or denial of a preliminary injunction.

If the circumstances were different, I would apply abuse of discretion review with respect to likelihood of success. That would leave me with the same result—affirming the preliminary injunction issued by the district court.

For example, on the state action issue, the Supreme Court has held several times that political parties—which are otherwise

private entities—can be state actors if state law "prescribes an election process that gives a special role to [them]." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 573 (2000). *See, e.g., Smith v. Allwright*, 321 U.S. 649, 663 (1944) (holding that the racially discriminatory "White Primary" conducted by the Texas Democratic Party constituted state action: "[Texas'] statutory system for the selection of party nominees for inclusion on the general election ballot makes the party which is required to follow these legislative directions an agency of the state in so far as it determines the participants in a primary election. The party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party."). Given such decisions, and for the reasons set out in the majority opinion, I do not believe that the district court committed a "clear error of judgment," *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc), in concluding that Mr. Jackon established a likelihood of success on the state action issue.

26-10854          WILLIAM PRYOR, C.J., Dissenting          1

WILLIAM PRYOR, Chief Judge, Dissenting:

I agree with the majority that Georgia's campaign finance scheme is likely unconstitutional. *See Davis v. FEC*, 554 U.S. 724, 738 (2008); *Scott v. Roberts*, 612 F.3d 1279, 1290–92 (11th Cir. 2010). Indeed, its unconstitutionality is plain. But Georgia officials enforce that unconstitutional scheme, and Burt Jones's leadership committee only benefits from it. So Rick Jackson's request for preliminary relief against Jones's leadership committee targets the wrong defendant. He contests this obvious point with a novel theory of state action that expands the doctrine to reach what a state permits instead of what it commits. Because the majority erroneously adopts this theory, I respectfully dissent.

True, the fact that Jackson's theory is novel does not doom it. Majority Op. at 20. But a fact-specific inquiry is not a license to contravene our precedents. And it is not unusual for a government to implement a campaign finance regime with unequal effects. *See Davis*, 554 U.S. at 738; *Scott*, 612 F.3d at 1291–92. In both *Davis* and *Scott*, the Supreme Court and we decided that the government could not create a competitive advantage for one candidate by penalizing the speech of the other. *See Davis*, 554 U.S. at 742; *Scott*, 612 F.3d at 1290–91. Yet both suits proceeded against the officials responsible for enforcing the laws that created those advantages, not against a committee chaired by the opposing candidate. And for good reason: a candidate who takes advantage of an unconstitutional system does not thereby become a state actor. It does not

matter that, in this appeal, the advantaged party happens to be the incumbent lieutenant governor.

Under our precedent, this appeal is straightforward. Jones's leadership committee acts in a *private* capacity, not as a state actor, when it supports his campaign for governor. *Cf. State v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023) (explaining that "[c]ampaigning for a specific candidate is not official conduct"); *see also Mackey v. Rising*, 106 F.4th 552, 561 (6th Cir. 2024) ("[A] state-agency official did not engage in state action when he participated in political activities."); *Blassingame v. Trump*, 87 F.4th 1, 5 (D.C. Cir. 2023) (stating that a sitting president campaigns for office "in an unofficial, *private* capacity as office-seeker, not an official capacity as office-holder" (emphasis added)); *Campbell v. Reisch*, 986 F.3d 822, 825 (8th Cir. 2021) ("Running for public office is not state action; it is a private activity."). We have said that candidate speech "during an election campaign occupies the core of the protection afforded by the First Amendment." *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002) (citation modified). And that principle extends to the enjoined acts of the leadership committee: both the "solicitation of campaign funds," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 446 (2015), and the "expenditure of money" in support of a campaign are political speech, *Buckley v. Valeo*, 424 U.S. 1, 16–17 (1976). Campaign committees too perform both functions. And all candidates, including incumbent officials, run their campaign committees in their private capacities. Those campaign committees are not state actors. Jones's leadership committee is no different.

26-10854          WILLIAM PRYOR, C.J., Dissenting                    3

That Jones acts in his private capacity makes Jackson's chosen "joint action" test a non-starter. Jackson may attribute the leadership committee's conduct to the state only when "the state has so far insinuated itself into a position of interdependence with the private parties that it was a joint *participant* in the enterprise." *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (emphasis added) (citation modified); *see also Charles v. Johnson*, 18 F.4th 686, 696 (11th Cir. 2021) (holding that the joint action test requires the "state or its agents" be a "willful participant in joint activity" with the private actor (citation modified)); *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1278 (11th Cir. 2003) (finding state action when "the state, *acting* through the private entity, caused the third party's harm" (emphasis added)). Jackson has not established any state involvement in the leadership committee's challenged fundraising and spending, much less the "pervasive entwinement" required to overcome the leadership committee's "private character." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001).

The state's role is entirely permissive: it allows the leadership committee to exist. The same can be said of almost any campaign committee created under state law. The state does not play the "affirmative role" in committee fundraising and spending our precedents require to establish *joint* action. *Rayburn*, 241 F.3d at 1348 (citation modified). At most, the state's role is limited to giving *permission* to some individuals to form leadership committees. The majority posits that the state permits leadership committees to advance its interest in "favoring . . . incumbent[s]." Majority Op. at

4                    WILLIAM PRYOR, C.J., Dissenting              26-10854

24. Setting aside the fact that leadership committees are available to certain non-incumbents—Jones himself is not an incumbent of the office he seeks—the state's motivation for authorizing leadership committees does not speak to whether it has made an "active choice to partner with" those committees or "conspire[d]" with them to deny Jackson his rights. *Charles*, 18 F.4th at 696.

The majority decides that there is an "active choice" here: the state, through Jones, has partnered with the leadership committee. In doing so, it decides that Jones's campaign for governor is an official act of the Office of Lieutenant Governor. Majority Op. at 21–22. The majority thus expands official conduct to include the canonical example of private speech: campaigning for office. There is no principled reason to do so. The office of lieutenant governor "as an institution is agnostic about who will occupy" the gubernatorial office next. *Blassingame*, 87 F.4th at 4. So "campaigning to *gain* that office is not an official act *of* the office" of lieutenant governor. *Id*. If any conduct is unofficial, the act of seeking a *new* job must qualify.

Georgia law reflects this reality. The provision allowing the formation of leadership committees is in the campaign finance chapter of the election code. *See* GA. CODE ANN. § 21-5-34.2. The Lieutenant Governor's powers, in contrast, are principally found in Title 28, which speaks to the operation of the General Assembly. *See, e.g., id.* §§ 28-4-1(a), 28-5-4(b), 28-5-22, 28-6-8(b)(2), (e); *see also* GA. CONST. art. V, § I, para. III ("The Lieutenant Governor shall be the President of the Senate."). Other portions of the Georgia Code

26-10854          WILLIAM PRYOR, C.J., Dissenting          5

largely speak to his power to appoint members of regulatory bodies. *See, e.g.*, GA. CODE ANN. §§ 12-5-575(a)(5), 15-1-21(c)(2), 15-1-21(c)(5), 31-11-101(a). Within Title 21, the only power conferred directly on the lieutenant governor is the authority to appoint a member of the State Election Board if a vacancy occurs when the General Assembly is not in session. *Id.* § 21-2-30(b). Nothing else in Title 21 confers official powers or duties on the Lieutenant Governor.

To be clear, I would reject Jackson's claim against Jones's leadership committee even if I were unsure that he had any other avenue for relief from this unconstitutional scheme. Even so, Jackson's ability to seek relief for his constitutional injury does not depend on his novel state action theory. Here, the "obvious remedy" for a candidate faced with unequal contribution limits is to seek to "raise or eliminate those limits," not to demand that his opponent's "contributions be regulated more strictly." *Davis*, 554 U.S. at 737, 743. Jackson could have sought a remedy against the state officials responsible for enforcing the contribution limits against him: members of the State Ethics Commission. After all, he sued them too. An injunction barring them from enforcing those limits would remedy his constitutional injury.

But Jackson did not seek that injunction. And it is not difficult to see why. As the district court found, Jackson is "outspending" Jones "by a large margin." Because Jackson is "self-fund[ing] his campaign," it would do him little good to enjoin the enforcement of any contribution limits against him. So he has declined to

seek the ordinary injunction that would solve his First Amendment injury. Instead, he seeks, and the majority grants him, an injunction that erases the well-trodden line between official and unofficial conduct. *Cf. DiDonato v. Panatera*, 24 F.4th 1156, 1160 (7th Cir. 2022) (stating that the fact that "one is a state officer does not necessarily mean that one acts under color of state law" (citation modified)).

If the leadership committee is not a state actor, then the consequences of today's decision are stark. The majority opinion blesses a preliminary injunction that directly limits the core political speech of one candidate while his opponent speaks unrestrained. Jones will "speak less" because of the majority's decision. *Scott*, 612 F.3d at 1296. Its provision barring campaign expenditures imposes on Jones a "prior restraint": the "most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Such restraints are especially concerning where the First Amendment "has its fullest and most urgent application," in the "conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). In these cases, federal courts should seek to employ "[t]he preferred First Amendment remedy of more speech, not enforced silence." *Brown v. Hartlage*, 456 U.S. 45, 61 (1982) (citation modified). Instead, the majority limits one side's political speech on the eve of an election.

*Davis* and *Scott* do not dictate this result. In both decisions, a government program penalized a candidate for speaking. *See Davis*, 554 U.S. at 740 (explaining that the Millionaire's Amendment "imposes a substantial burden on the exercise of the First Amendment

right to use personal funds for campaign speech"); *Scott*, 612 F.3d at 1290 ("[T]he subsidy imposes a burden on nonparticipating candidates."). Because the government's chosen burden enabled the candidates' opponents to speak more, there was no way to remedy these inequities without causing one candidate to "speak less." *Scott*, 612 F.3d at 1296. We do not face that dilemma today.

Unlike the remedies at issue in *Davis* and *Scott*, this injunction is not limited to "holding all candidates to the ordinary contribution limits." Majority Op. at 31. It bars Jones's leadership committee from "soliciting contributions and making *any* expenditures in support" of his campaign. So it is not true that this injunction "appl[ies] the same campaign limitation to both Jones and his competitors." *Id*. at 32. The statute, of course, contains no expenditure limitation. Jones's leadership committee and Jackson's campaign committee are both free to expend unlimited resources in support of their campaigns.

This injunction will have the "primary effect" of "restrict[ing] the quantity of campaign speech" by Jones. *Buckley*, 424 U.S. at 39. The majority insists that this limitation is not a "prior restraint." Majority Op. at 32. But I have no other term for a "judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis omitted) (citation modified). Unlike the forfeiture order permitted by *Alexander*, the restraint on speech the majority blesses is not collateral: it literally "*forbid*[s] [Jones's leadership committee from] engag[ing]

in . . . expressive activities in the future." *Id*. at 550–51. Perhaps some other injunction could leave Jones's leadership committee free to "continue [its] expressive activities with other funds," but this one does not. Majority Op. at 32 (citation modified).

In this context, a preliminary injunction is all but permanent. The runoff election is only days away. Even if there were time to litigate this case to final judgment, Jackson would have no incentive to do so. Our decision today will likely set the rules for the rest of the campaign.

We should vacate the preliminary injunction. That resolution would still allow Jackson to seek a remedy against the state officials he sued. Because the majority instead adopts Jackson's novel theory of state action, I respectfully dissent.